JS 44 (Rev. 06/17)

**CIVIL COVER SHEET** 17-CV-4115

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| GAB AI Inc. | Google, LLC |
| **(b)** County of Residence of First Listed Plaintiff Philadelphia | County of Residence of First Listed Defendant CA |
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)* |
| | NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |
| **(c)** Attorneys *(Firm Name, Address, and Telephone Number)* | Attorneys *(If Known)* |
| A. Jordan Rushie<br>100 N Hancock St<br>Phila PA 19123 | |

| II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)* | | III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff* |
|---|---|---|

*(For Diversity Cases Only)* and One Box for Defendant)

| | | | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|---|---|
| ❏ 1 U.S. Government Plaintiff | ☒ 3 Federal Question *(U.S. Government Not a Party)* | Citizen of This State | ☒ 1 | ❏ 1 | Incorporated *or* Principal Place of Business In This State | ❏ 4 | ❏ 4 |
| ❏ 2 U.S. Government Defendant | ❏ 4 Diversity *(Indicate Citizenship of Parties in Item III)* | Citizen of Another State | ❏ 2 | ☒ 2 | Incorporated *and* Principal Place of Business In Another State | ❏ 5 | ❏ 5 |
| | | Citizen or Subject of a Foreign Country | ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*  Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ❏ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ❏ 625 Drug Related Seizure of Property 21 USC 881 | ❏ 422 Appeal 28 USC 158 | ❏ 375 False Claims Act |
| ❏ 120 Marine | ❏ 310 Airplane | ❏ 365 Personal Injury - Product Liability | ❏ 690 Other | ❏ 423 Withdrawal 28 USC 157 | ❏ 376 Qui Tam (31 USC 3729(a)) |
| ❏ 130 Miller Act | ❏ 315 Airplane Product Liability | ❏ 367 Health Care/ | | | ❏ 400 State Reapportionment |
| ❏ 140 Negotiable Instrument | ❏ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☒ 410 Antitrust |
| ❏ 150 Recovery of Overpayment & Enforcement of Judgment | ❏ 330 Federal Employers' Liability | Product Liability | | ❏ 820 Copyrights | ❏ 430 Banks and Banking |
| ❏ 151 Medicare Act | ❏ 340 Marine | ❏ 368 Asbestos Personal Injury Product | | ❏ 830 Patent | ❏ 450 Commerce |
| ❏ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ❏ 345 Marine Product Liability | Liability | | ❏ 835 Patent - Abbreviated New Drug Application | ❏ 460 Deportation |
| | | **PERSONAL PROPERTY** | **LABOR** | ❏ 840 Trademark | ❏ 470 Racketeer Influenced and Corrupt Organizations |
| ❏ 153 Recovery of Overpayment of Veteran's Benefits | ❏ 350 Motor Vehicle | ❏ 370 Other Fraud | ❏ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ❏ 480 Consumer Credit |
| ❏ 160 Stockholders' Suits | ❏ 355 Motor Vehicle Product Liability | ❏ 371 Truth in Lending | ❏ 720 Labor/Management Relations | ❏ 861 HIA (1395ff) | ❏ 490 Cable/Sat TV |
| ❏ 190 Other Contract | ❏ 360 Other Personal Injury | ❏ 380 Other Personal Property Damage | ❏ 740 Railway Labor Act | ❏ 862 Black Lung (923) | ❏ 850 Securities/Commodities/ Exchange |
| ❏ 195 Contract Product Liability | ❏ 362 Personal Injury - Medical Malpractice | ❏ 385 Property Damage Product Liability | ❏ 751 Family and Medical Leave Act | ❏ 863 DIWC/DIWW (405(g)) | ❏ 890 Other Statutory Actions |
| ❏ 196 Franchise | | | | ❏ 864 SSID Title XVI | ❏ 891 Agricultural Acts |
| | | | | ❏ 865 RSI (405(g)) | ❏ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ❏ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ❏ 895 Freedom of Information Act |
| ❏ 210 Land Condemnation | ❏ 440 Other Civil Rights | **Habeas Corpus:** | ❏ 791 Employee Retirement Income Security Act | ❏ 870 Taxes (U.S. Plaintiff or Defendant) | ❏ 896 Arbitration |
| ❏ 220 Foreclosure | ❏ 441 Voting | ❏ 463 Alien Detainee | | ❏ 871 IRS—Third Party 26 USC 7609 | ❏ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ❏ 230 Rent Lease & Ejectment | ❏ 442 Employment | ❏ 510 Motions to Vacate Sentence | | | |
| ❏ 240 Torts to Land | ❏ 443 Housing/ Accommodations | ❏ 530 General | | | ❏ 950 Constitutionality of State Statutes |
| ❏ 245 Tort Product Liability | ❏ 445 Amer. w/Disabilities - Employment | ❏ 535 Death Penalty | **IMMIGRATION** | | |
| ❏ 290 All Other Real Property | ❏ 446 Amer. w/Disabilities - Other | **Other:** | ❏ 462 Naturalization Application | | |
| | ❏ 448 Education | ❏ 540 Mandamus & Other | ❏ 465 Other Immigration Actions | | |
| | | ❏ 550 Civil Rights | | | |
| | | ❏ 555 Prison Condition | | | |
| | | ❏ 560 Civil Detainee - Conditions of Confinement | | | |

| V. ORIGIN *(Place an "X" in One Box Only)* | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ❏ 2 Removed from State Court | ❏ 3 Remanded from Appellate Court | ❏ 4 Reinstated or Reopened | ❏ 5 Transferred from Another District *(specify)* | ❏ 6 Multidistrict Litigation - Transfer | ❏ 8 Multidistrict Litigation - Direct File |

**VI. CAUSE OF ACTION**  Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*: Sherman Act
Brief description of cause: Google are Twitter monopolize Market

| VII. REQUESTED IN COMPLAINT: | ❏ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P. | DEMAND $ | CHECK YES only if demanded in complaint: JURY DEMAND: ❏ Yes ❏ No |
|---|---|---|---|

| VIII. RELATED CASE(S) IF ANY | *(See instructions:)* JUDGE | DOCKET NUMBER SEP 14 2017 |
|---|---|---|

DATE 9/14/17

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

| RECEIPT # | AMOUNT | APPLYING IFP | JUDGE | MAG. JUDGE |
|---|---|---|---|---|

**UNITED STATES DISTRICT COURT**   **17   4115**

FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff: 1900 Market Street, Phila PA

Address of Defendant: 6425 Penn Ave, 1600 Ampitheatr Parhwy, Mountainview, CA

Place of Accident, Incident or Transaction: _____

*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?
(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))   Yes☑  No☐

Does this case involve multidistrict litigation possibilities?   Yes☑  No☐
*RELATED CASE, IF ANY:*
Case Number: _____ Judge _____ Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
   Yes☐  No☐
2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
   Yes☐  No☐
3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?   Yes☐  No☐
4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
   Yes☐  No☐

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*
1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
    (Please specify) _____

B. *Diversity Jurisdiction Cases:*
1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
    (Please specify) _____

**ARBITRATION CERTIFICATION**
*(Check Appropriate Category)*
I, Jordin Rushu, counsel of record do hereby certify:
☐ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;
☐ Relief other than monetary damages is sought.

DATE: 9/14/17   _____ Attorney-at-Law   209066
Attorney I.D.#

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

SEP 14 2017

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 9/14/17   _____ Attorney-at-Law   209066
Attorney I.D.#

CIV. 609 (5/2012)



## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

|  | : | CIVIL ACTION |
|---|---|---|
| v. | : | **17**    4 1 1 5 |
|  | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

### SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.       ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits.       ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.       ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court. (See reverse side of this form for a detailed explanation of special
    management cases.)       ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.

| 9/14/17 | J. | Plaintiff |
|---|---|---|
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215-268-3978 | 215-525-0909 | JRushie@Rushie Law.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

SEP 14 2017





IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **GAB AI INC.**, | Civil Action: |
| *Plaintiff*, | |
| vs. | 17   4115 |
| **GOOGLE, LLC,** | |
| *Defendant.* | |

**COMPLAINT AND JURY DEMAND**



FILED

SEP 1 4 2017

KATE BARKMAN, Clerk
By_____ Dep. Clerk

Plaintiff Gab AI Inc, a Delaware corporation, by and through its attorneys,
Randazza Legal Group PLLC, for its complaint against defendant Google, LLC., says
and alleges as follows:

## THE PARTIES

1.     Gab AI Inc. is a Delaware corporation authorized to do business in the
Commonwealth of Pennsylvania with a place of business at 1900 Market Street,
Philadelphia, Pennsylvania.

2.     Defendant Google LLC is a Delaware limited liability company that is a
wholly-owned subsidiary of Alphabet, Inc. with a place of business at 6425 Penn
Avenue, Pittsburgh, Pennsylvania, with its principle place of business at 1600
Amphitheatre Parkway, Mountain View, California.

## JURISDICTION AND VENUE

3.       This court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1337 and 1338 because it involves claims arising under the Sherman Act, 15 U.S.C. §§ 15 and 26 because it involves claims arising under the Clayton Act and 28 U.S.C. § 1332(a)(1), as the parties are of diverse citizenship and the controversy exceeds $75,000, exclusive of interest and costs.

4.       This Court has supplemental jurisdiction over the claims in this Complaint that arise under state statutory and common law pursuant to 28 U.S.C. § 1367(a) because the state law claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

5.       This Court has personal jurisdiction over the defendant because it transacts business in the Commonwealth of Pennsylvania through its office in Pittsburgh, Pennsylvania and its extensive web-based services.

6.       Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), (c) and (d) and 15 U.S.C. § 22.

## FACTS

**What Gab is For and its Mission**

7.       Gab AI Inc operates a social network found at the domain www.Gab.ai ("Gab").

8.       The top-level domain ".ai" used by Gab is the Internet country code top-level domain (ccTLD) for Anguilla, a British overseas territory in the Caribbean, whose government administers it. Since early 2016, domain names using the "ai" ccTLD or

2

"extension" have been adopted by businesses, such as Gab, from all over the world whose offerings relate to the field of artificial intelligence ("AI").

9.     The founders and principal shareholders of Gab are Andrew Torba, a U.S. national with a background in social media startups who acts as Gab's chief executive officer, and Ekrem Büyükkaya, a citizen and resident of the Republic of Turkey, who is Gab's chief technology officer.

10.     Gab launched via private invitation-only beta in August 2016, opened to the public for membership in May of 2017, and presently has approximately 268,000 users.

11.     Twitter ran into controversy in 2016 when it was accused of censoring conservative voices, either by banning outspoken conservatives outright or otherwise compromising their ability to communicate on the Twitter platform.

12.     In light of these developments, Mr. Torba, an alumnus of Silicon Valley's prestigious "Y Combinator" accelerator, and Mr. Büyükkaya saw a market opportunity for a competitor focused on free speech that would provide a platform for conservatives in the West and dissidents globally.

13.     Despite their shared enterprise interests, Mr. Torba and Mr. Büyükkaya came to the Gab projects with very different political perspectives.

14.     Mr. Torba is a supporter of President Donald Trump whose fervent advocacy of his policies and positions have had the predictable result of his being labeled, inappropriately, with the various labels and epithets that are now the common currency of political mudslinging.

3

15.    Indeed, as a result of tensions centered around his fervent assertion of his political views, particularly concerning immigration, within the Y Combinator alumni community around the time of the presidential election in November 2016, Mr. Torba was barred from the network's alumni website.

16.    This experience confirmed for Mr. Torba his perception, which animated his involvement with Gab, that conservative voices are routinely suppressed in social media and in a wide variety of contexts where the dominant, and overwhelmingly liberal figures and institutions of Silicon Valley hold sway.

17.    In contrast, Gab co-founder Mr. Büyükkaya, a Turkish Muslim, has not hesitated to express his disdain for President Trump. He explained his motivation to build Gab as arising from concerns about the repression of speech online around the world and the direction that the open internet was heading.

18.    Gab offers telecommunications and social networking services, namely, providing live-streaming of video, online chat rooms, and electronic bulletin boards for the transmission of messages among users with respect to any lawful topic of interest.

19.    Gab is superficially similar to Twitter. Users can post "Gabs," which have a 300 character limit, that are comparable to the 140-character "tweets" posted by users on Twitter.

20.    As on Twitter, Gab users can follow other "Gabbers" and be followed back.

21.    Borrowing a feature from Reddit, one of the original social networks that focuses on communication and real-time interaction, Gabbers can "upvote" or "downvote" Gabs.

4

22.     By virtue of the latter option, Gab offers users a third alternative – in addition to ignoring a post – to express their views concerning a post, in contrast to Twitter, which only permits "like" votes.

23.     Gabs are ranked based on these votes.

24.     Gabs are also displayed in a chronological home feed, which is no longer a default option on other social channels.

25.     In February of 2017, Gab also launched GabTV, a video platform intended as an alternative to YouTube, which has also recently been criticized for seemingly capricious acts of censorship and viewpoint-based discrimination.

26.     Gab's technological development plans include the increasingly more sophisticated use of artificial intelligence to help surface breaking news and trending Gabs, offer on-demand information resources to users through Gab "chatbots" (programs that simulate human speech) and flag NSFW ("not safe for work") content for review.

27.     Gab has over a quarter of a million users from around the world.  Its top five markets are the United States, Germany, The United Kingdom, Canada, and Australia.

28.     Gab empowers creators, supports free speech and defends the free flow of information online.

29.     Gab describes its mission as "bringing folks together of all races, religions, and creeds who share in the common ideals of Western values, individual liberty and the free exchange and flow of information" and to "provide people with the tools they need to create and shape their own experience."

5

30.     Notwithstanding this expression of values, Gab does not restrict or censor content, including content that conflicts with its own values or mission or those of its founders or executives, except in the narrow circumstances provided in its Community and Guidelines and the Terms and Conditions of use for its site, both of which are posted online and are publicly available at all times.

31.     As set forth there, Gab prohibits all unlawful conduct, including illegal pornography and terrorism; the posting of confidential information of others; communications calling for acts of violence; promotion of acts of self-harm or cruelty; the use of threatening language; and any other behavior that clearly infringes on the safety of another user or individual.

32.     Gab users are also required, under these provisions, to flag their own posts as NSFW if appropriate.

33.     Gab follows the U.S. Department of State's definitions of terrorism and list of Foreign Terrorist Organizations, along with the Federal Bureau of Investigation's proscribed list of terrorist groups, organizations and individuals.

34.     Beyond these guidelines, however, Gab does not, on its own accord, restrict, promote or manage content on its site based on political, corporate, ideological or other viewpoint-based grounds.

35.     In this respect Gab differs significantly from leading social media networks and platforms such as Twitter, Facebook, Google and others, which have made the elimination of "hate speech" within their realms a publicly-prominent priority.

36.     The term "hate speech" is necessarily defined by a particular point of view.

6

37.     For this reason, some unpopular and even offensive – but lawful – points of view and speakers who have either been effectively muted or actively banned from platforms such as Twitter or Facebook use Gab.

38.     "Timelines" on Twitter and Gab consist of all posts by users a member follows, which are typically presented in reverse chronological order, as in the style of a blog. In other words, the most recent posts – tweets or gabs – by one's followers are presented visually at the top of one's "timeline," and progressively older ones can be read as the user reads or scrolls down the screen of the device on which they are being read.

39.     Users on Gab, as on Twitter, will not encounter content from users they do not follow unless the users they do follow quote or re-post them.

40.     Gabbers have the option of muting any particular user to prevent the muted user's gabs from showing up in their timelines even if that content is quoted or re-posted.

41.     Gabbers can also minimize their likelihood of engaging with users whose content offends them by activating a setting that prevents a given account from following them, hence making interaction less likely.

42.     Unlike Twitter, however, which permits users to be "blocked" from even viewing otherwise public posts, Gab permits all users to view all public posts by other users.

43.     As a result, even a muted Gabber can reply to, comment about or quote posts by the user who muted him, although because of the muting the original poster will not be aware of that response.

44.     Twitter also offers muting as well as blocking.

7

45.     By design, Gab does not permit blocking. Gab's creators hope to avoid the formation of what are known as "echo chambers" found on other social media platforms, where many posts are accessible only to users of a common ideological or political stripe and dialog across such boundaries is increasingly rare.

46.     Users dissatisfied with the Gab experience may cease using Gab or delete their accounts at any time.

**Gab's Growth**

47.     Gab is an entirely advertising-free service.

48.     Gab does not sell access to or otherwise "monetize" information about its users, in the aggregate or otherwise.

49.     During 2016, Gab operated entirely by donations, raising $150,000 by a fundraising campaign initiated in October of 2016.

50.     During 2017, Gab implemented an online, premium-user subscription program, GabPro, which is intended to be the primary source of its ongoing revenue.

51.     Subscription fees for GabPro are collected primarily from credit cards at the beginning of the subscription period. Subscription revenues are recognized ratably over the subscription period, ranging from one month to one year, net of estimated cancellations.

52.     By August of 2017, 2,500 customers had subscribed to GabPro.

53.     By September of 2017, that number had increased to over 3,000 paid GabPro members.

54.     In July of 2017, Gab offered shares to investors pursuant to Securities Act Section 4(a)(6) or "Regulation Crowdfunding" of Title III of the Jumpstart Our Business

Startups (JOBS) Act of 2012, an approved procedure for raising a maximum aggregate amount of $1,070,000 in a 12-month period via crowdfunding.

55.     In only 38 days Gab hit the $1.07 million Title III crowdfunding limit, and shortly thereafter announced it could no longer accept investments because of the limits for crowdfunding set by the Securities and Exchange Commission in Regulation Crowdfunding.

56.     To raise the capital necessary to fund the business model described in its plan as well as its growing technological and security needs, Gab has begun planning for an initial coin offering ("ICO"), a method for raising funds that bypasses the regulated and often exploitative capital-raising process dominated by venture capitalists and investment banks.

57.     In an ICO campaign, a percentage of a given cryptocurrency, typically Bitcoin, is sold to early backers of the project in exchange for legal tender or other cryptocurrencies, which are essentially private fiat "currencies" that are really tokens that have value only among the virtual communities that recognize them.

58.     Because, in fact, the growth of such virtual "economies" has often resulted in the virtual currencies associated with them taking on bona fide financial value, this form of "crowd selling" has been recognized as a potentially dynamic method of raising capital under the right circumstances.

59.     As a result of Gab's successful launch, its first round of crowdfunding, its notoriety and its rapid growth, it anticipates that its ICO, based on the successful Ethereum virtual currency, will result in a substantial influx of capital.

9

**The App Stores**

60. According to one recent study, U.S. consumers spend 57 percent of their time utilizing digital media through mobile applications, or "apps," on their smartphones and tablets.

61. The two main distribution channels of mobile apps are Apple's App Store and the Google Play Store, which facilitate the downloading of apps for use on Apple's iOS and Google's Android operating system respectively.

62. Android and iOS accounted for 99.6 percent of all smartphone sales in the fourth quarter of 2016, an increase from 96.8 percent as of the second quarter of 2015.

63. Of the 432 million smartphones sold in the last quarter of 2015, 352 million ran Android (81.7 percent) and 77 million ran iOS (17.9 percent), for a total of 98.4 percent of the market.

64. Other sources report Android phones as capturing 88% of the global smartphone market.

65. Apple's App Store was launched in 2008 with 500 apps available. Five years later the total number of apps passed the 1 million milestone, and in January of 2017, Apple's App Store reached 2.2 million apps.

66. Google also launched its Play Store, originally called the Android Market) in 2008 but its growth outpaced that of Apple. As of January, the total number of Android apps in the Google Play Store was over 2.7 million.

67. In 2016 over 75 billion apps were downloaded from Google's Play just slightly over 25 billion downloads were made via Apple's App Store.

10

68.     Both Google Play Store and the App Store have similar revenue-sharing terms, pursuant to which 30% of revenue goes to the store while 70% is released to app developers.

69.     Although Apple's App Store is more profitable than Google's Play Store, despite its smaller number of offerings and download, many analysts expect Google to overcome Apple, at least with respect to total revenue, as early as this year.

70.     Developers in U.S. and Europe prefer iOS, Android is more popular in emerging markets such as India and Mexico, due in part to the fact that Android devices are less expensive, and are available in far wider range of prices and configurations, than iPhones.

**Gab and the Apple App Store**

71.     Gab was never permitted to offer its mobile app for iOS on the Apple App Store.

72.     Apple's initial stated reason for its refusal to permit iOS users to download Gab was that Gab was utilized for distribution of "pornography," which was baseless under the applicable guidelines and the facts.

73.     Apple subsequently rationalized its refusal to permit iOS users to download Gab on the grounds of Gab's NSFW filter's functionality, a missing EULA and contact information and App Store technical compliance, each one of which was corrected.

74.     After each submission by Gab to Apple of a revised "build" (updated version) of the Gab app, Apple acknowledged Gab's compliance within one or two days at the most.

11

75.     Following Gab's resolution of the last of the series of technical and compliance concern raised by Apple, however, Apple then delayed a full 17 days until rejecting Gab on a new ground:  That the Gab website included content – posted by users – that "could be considered defamatory or mean-spirited," including comments based on ethnicity, gender or other "targeted groups."

76.     Apple obtained this content by going to Gab's desktop site and searching for specific "hate speech" terms.

77.     Apple informed Gab that if Gab would "remove all defamatory and mean-spirited content from [its] app" and submit it to review, Apple would reconsider its rejection.

78.     It is impossible, however, for any social media platform that has 250,000 users to "remove all defamatory and mean-spirited content," much less to prevent such content from being posted prospectively forever.

79.     Even if it were possible for a social media platform to censor "defamatory and mean-spirited content" generated by 250,000 users, doing so would be phenomenally time-consuming and cost-prohibitive.

80.     Even it were possible for a social media platform to censor "defamatory and mean-spirited content" generated by 250,000 users, doing so would result in a substantial loss of users.

81.     Even if it were possible for a social media platform to censor "defamatory and mean-spirited content" generated by 250,000 users, a level of content censorship by a social media platform that extended to "defamatory" and "mean-spirited" content would place at risk that service's status as a protected Internet Service Provider, as opposed to a

12

publisher or speaker, under 47 U.S. Code § 230, also known as Section 230 of the Communications Decency Act ("CDA").

82.     Unlike an Internet Service Provider, a publisher or speaker is not granted the "safe harbor" benefits of Section 230, and may be held liable for defamation or other torts or other liability arising from content published on a platform it owns or manages.

83.     Innumerable social news apps available on the Apple App Store contain more than a trivial amount of "defamatory and mean-spirited content."

84.     Such apps include social news apps such as Twitter, YouTube and Facebook, as well as entertainment apps such as iTunes and apps affiliated with virtually every broadcast, cable or satellite network.

85.     Apple rejected the Gab app on the ground that Gab was a social news app with mean-spirited content on January 21, 2017, the day after the inauguration of Donald Trump as President of the United States.

**Gab and the Google Play Store**

86.     Unlike iOS, the Android operating system permits users to download apps other than through its app store, and the practice is common, although no statistics are available to establish the percent of apps downloaded outside the Play Store.

87.     The practice of downloading Android apps outside the Play Store requires bypassing a default security option on Android devices, and is intimidating to many users.

88.     Moreover, according to some experts, downloading Android apps other than via the Play Store is unwise because of the lack of supervision and vetting by Google over such apps.

13

89.     Google is one of the experts that recommends users not download Android apps other than through the Play Store.

90.     A December, 2016 article in *Wired* magazine entitled "Never Ever (Ever) Download Android Apps Outside of Google Play," said the following about apps downloaded through means other than the Play Store:

> "Google Play automatically scans for potentially malicious apps as well as spammy accounts before they are published on the Google Play Store," Google said in a statement to WIRED. "We also introduced a proactive app review process to catch policy offenders earlier in the process and rely on the community of users and developers to flag apps for additional review." There's usually no way to know whether third-party app vendors offer this (or any) type of oversight. And malicious apps aren't a minor threat.

> "We work three to four cases a week around apps that have been seeded within the secondary app store market that conduct a variety of attacks from stealing money to rooting a phone for information stealing purposes," says Dan Wiley, the head of incident response at Check Point, the security firm that discovered Gooligan. "When you buy or download an app from the genuine store a number of controls are in place to detect the fake and hostile apps. When you get your apps from somewhere other than the official stores, well, instead of just not getting the real thing you could lose your money, lose your personal information."

> . . .

> "I definitely recommend getting things from the official sources," says James Bettke, a counter threat unit researcher at the security intelligence firm SecureWorks. "Think before you click. Google Play establishes trust. You can trust that that app is made by a certain vendor or individual. With a third-party store you don't know what you're getting." . . .

14

As desktop browsing declines and more people spend time on their mobile
screens, apps are an increasingly appealing and lucrative target for hackers.
"More and more critical functions and transactions are being executed through the
apps," says Sam Rehan, chief technology officer at the mobile security firm
Arxan. "At the rate that online transactions are growing, things will only get more
intense."

91.     Another recent article, in the popular technology culture website Ars
Technica, described a vicious form of malware that was threatening Android users via
downloaded apps, and advised users, "As always, Android users should avoid using
third-party app stores, with the notable exception of Amazon's."

92.     Besides being relegated to near-pirate status by Google itself, numerous
incentives and programs provided by Google which leverage Googles almost all-
encompassing Internet advertising and search dominance give apps provided via the Play
Store an irresistible leg up over those not available through that channel.

93.     For example, Android apps distributed through the Play Store are eligible
to place ads for their apps on the Google Play home page and app listing pages, designed
to reach customers while they are browsing through the Play Store looking for something
new to install and try.

94.     These ad placements, introduced by Google in May of 2017, were
described by Google as allowing developers to reach Google Play users in 190 countries
around the world.

95.     Alongside the launch of the new ads, Google also announced expanded
Smart Bidding options in its Universal App Campaigns program to allow developers to
better target a specific subset of users, such as those who are more loyal or spend who
more on in-app purchases.

96.     As Google promotes the program, "Universal App campaigns streamline the process for you, making it easy to promote your apps across Google's largest properties including Search, Google Play, YouTube, and the Google Display Network."

97.     In connection with this initiative, in the spring of 2017 Google launched an analytics program called App Attribution Partners to integrate data from seven third-party measurement providers directly in AdWords.

98.     Another competitive advantage provided only to Android apps approved for inclusion in the Google Play Store are the availability of Mobile App Install Campaigns, which create custom app install ads exclusively for mobile devices. Mobile app install ads can appear on Google's Display Network, Search Network (Google Play and Google Search) or on YouTube.  Based on an approved app's icon and reviews, they facilitate downloads by forwarding interested consumers directly to the Play Store.

99.     Similarly, another program available only to Play Store apps, Mobile App Engagement Campaigns, finds users interested in approved apps engaging, through ads in other apps, with users who have already installed an approved app. These ads encourage users who may have uninstalled or ceasing using an approved app to try the app again, engage them to open it or encourage them to take some other specific action.

100.    Research firm eMarketer estimated, in 2015, that the U.S. App Install ad market accounted for nearly 9 percent of mobile advertising spend at $1.67 billion in 2014 and that it would grow by 80 percent to $3 billion by the end of 2015.

101.    None of these programs, all of which leverage the power of Google AdWords, is available to Android apps made available via download outside the Play Store.

16

102.    As shown below, Google competes with Gab in multiple respects.

103.    For the foregoing reasons, and as shown below for other reasons as well, Google has monopoly power in the market for sale and distribution of Android apps.

**Google's Anti-Competitive Practices**

104.    The foregoing description of one aspect Google's market influence in the Android apps sector is just one example of Google's ability to use its cross-platform dominance as a lever to affect a wide range of businesses, sectors and markets in the technology and Internet fields.

105.    That market power, which amounts to monopoly power in many respects, profoundly enhances Google's monopoly power over the sale and distribution of Android apps, and in particular social news apps for use on the Android operating system.

106.    Google's dominance in multiple markets and technological sectors has been the subject of intense scrutiny in the last year from overseas regulators as well as commentators and scholars.

107.    While Google's original, famous search engine has been the key to its original success, it has expanded on that success by acquiring competing search engines, online advertising firms, mobile browser competitors, mobile technologies and their creators or purveyors, video sharing technologies and platforms, social media and gaming communities and artificial intelligence companies at the astonishing rate of one company per week since 2010.

108.    As of December 2016, Google / Alphabet had acquired over 200 companies, of which it only divested itself of four.

17

109.    Google's largest acquisition was its purchase of Motorola Mobility, a mobile device manufacturing company, for $12.5 billion in late 2011.

110.    Google's acquisition of Motorola acquisition was the subject of an investigation, and ultimately the filing of a complaint, by the Federal Trade Commission ("FTC").

111.    To settle charges that it violated Section 5 of the FTC Act by engaging in unfair methods of competition and unfair acts or practices related to the licensing of standard essential patents (SEPs) for cellular, video codec, and wireless LAN standards, Google agreed to change some of its business practices.

112.    Under a settlement reached with the FTC in 2013, Google agreed to meet its prior commitments, and those of Motorola as its predecessor, to allow competitors access – on fair, reasonable, and non-discriminatory ("FRAND") terms – to patents on critical standardized technologies needed to make popular devices such as smart phones, laptop and tablet computers, and gaming consoles ("standards essential" patents).

113.    Though Google paid $12.5 billion for Motorola in 2011, in the course of three years it sold off its component business units, ultimately acquiring approximately 17,000 patents it valued $5.5 for less than a billion dollars.

114.    Despite its agreement with the FTC, Google wasted no time attempting to use its new patent portfolio to restrict competition.

115.    Microsoft integrated the technologies covered by those patents into its Windows software and Xbox video console on the assumption that it could obtain a license at FRAND rates of .555 cents (half a penny) or 3.71 cents per unit.

18

116.   Google, however, demanded that Microsoft agree to pay 2.25% of the selling price of every Xbox and Windows computer it sold.

117.   When Microsoft delayed in responding, Google sued for patent infringement and sought injunctions to bar the sale of the company's products in the U.S. and Germany.

118.   Ultimately, over 20 lawsuits were lodged in the U.S. and Germany pitting Google against not only Microsoft – essentially seeking an injunction prohibiting the sale of every single Xbox or Windows product – but Apple as well.

119.   Google was ultimately found liable for breach of contract under the industry standards arrangement ordered to pay Microsoft $14.52 million.

120.   The outcome was affirmed by the Ninth Circuit Court of Appeals in 2015, which found that Google had breached the covenant of good faith and fair dealing in its conduct regarding the FRAND agreements and that the district court was justified in taking the unusual step of awarding attorneys' fees, despite the absence of a statutory or contractual fee-shifting provision, because of Google's bad faith.

121.   On the consumer-facing side of its business, a large percentage of Google products and services it now offers also, like most of its patent portfolio, originated as offerings of companies that Google has since acquired.

122.   Google has leveraged its ownership of the proprietary technologies acquired along with these companies, as well as their established user bases, networks or distribution, by integration into its increasingly vast and progressively more dominant position in Internet search, advertising, e-commerce and mobile devices.

123.    By doing so, Google has progressively increased its market power in innumerable markets and sub-markets in these fields, giving it the power to dictate not only economic and competition rules on markets but to control the very content made available to Internet users, both directly and indirectly.

124.    In recent months, antitrust enforcement officials in the European Union and Russia have imposed large penalties on Google for preloading Android with Google apps such as Chrome, which places competitors such as Microsoft and Mozilla, who offer consumers the Bing and Firefox browsers respectively, at a distinct disadvantage.

125.    Google's abuse of its dominant competitive position, particularly its integration of browsing, search, context-based advertising, resulted in a record fine of €2.42 billion, or approximately $2.7 billion, following a seven-year investigation into its exploitation of its dominant search engine to promote its own online shopping service at the expense of other price comparison sites.

126.    The EU investigation concluded that when Internet users searched Google for products such as clothes or electronics, the results would prominently feature Google's own price comparison service at the expense of competing services, resulting in commissions for items purchased flowing to Google.

127.    Although Google has reserved the right to appeal this fine, paying it would have an almost trivial effect on its business.

128.    As the recipient of approximately 85% of all Internet advertising spending and the beneficiary of the substantial network and market-dominance effects described above, Google's then-parent company, Alphabet, announced second-quarter operating

income of $4.1 billion – after subtracting the amount of the fine – on quarterly revenue of $26 billion.

129.    Notwithstanding its wealth, however, Google's awareness of its vulnerability on the issue of its anticompetitive position and conduct was demonstrated by its censorious reaction when, shortly after the announcement of the EU decision, Barry Lynn, the director of the New America think tank's Open Markets program, congratulated the EU on its decision.

130.    The Open Markets group led by Lynn contains many of the most respected voices in an increasingly prominent discussion about technology and telecom monopolies, and its findings about corporate consolidation and monopolistic power is seen as extremely influential in turning antitrust into such an important policy issue that the Democratic Party has included stricter antitrust regulation as a plank in its platform for 2018.

131.    Consistent with that approach, Lynn wrote, following the announcement of the EU fine, a blog post stating: "Google's market power is one of the most critical challenges for competition policymakers in the world today. By requiring that Google give equal treatment to rival services instead of privileging its own, [EU Commissioner Margrethe] Vestager is protecting the free flow of information and commerce upon which all democracies depend."

132.    Google, however, is a major donor to New America, which Google executive chairman Eric Schmidt chaired until 2016.

21

133.    According to the New York *Times*, New America's president Anne-Marie Slaughter spoke to Lynn a few days later, following which she wrote in an email that New America and Open Markets would be "ending their partnership."

134.    According to *New York* magazine, "Google's attempts to influence policy and regulation are far from secret. More than any other tech company, Google spends millions on lobbying and think tanks. It's particularly aggressive meddling in the halls of power has also led it down more dubious paths, like funding academics, sometimes undisclosed, to produce papers favorable to Google's policy aims."

**Gab and the Google App Store**

135.    Gab was approved and became available for download on Google's Android Play Store in May 2017.

136.    Following its placement in the Play Store, Gab's download and the number of Pro memberships – the lynchpin of its revenue model – surged.

137.    Gab's rollout in the Play Store, and the significance that signaled to market as to its viability as a business and as an alternative to Twitter, also led to an increase in donations to support the development of Gab.

138.    On August 17, 2017, Google Play Support notified Gab that Gab's Android app was being "suspended and removed from Google Play as a policy strike [i.e., removal] because it violates the hate speech policy."

139.    Moreover, because Gab is not itself a content creator but is, instead, a social network, the reference to "hate speech" in the notice from the Google Play Store could only refer to content posted by third parties, i.e., Gab users.

22

140.    Indeed, in a subsequent email to Ars Technica, Google explained as follows:

>   In order to be on the Play Store, social networking apps need to demonstrate a sufficient level of moderation, including for content that encourages violence and advocates hate against groups of people. This is a long-standing rule and clearly stated in our developer policies.

141.    The entirety of Google Play's Hate Speech policy set forth in its Developer Policy Center, however, reads simply, "Hate Speech: We don't allow apps that advocate against groups of people based on their race or ethnic origin, religion, disability, gender, age, nationality, veteran status, sexual orientation, or gender identity."

142.    There is no reference in Google's Hate Speech Policy to "moderation."

143.    Indeed, there is no definition of what exactly constitute "sufficient levels of moderation" anywhere in the Google Play Development Policy Center.

144.    Rather, Google's policy concerning  "User Generated Content" (UGC) states only that apps UGC-oriented apps "must take additional precautions in order to provide a policy compliant app experience," requiring apps to define and prohibit objectionable content via terms of service, implement a system to report content, and block users."

145.    Gab meets all these requirements, as set forth above.

146.    Google, in fact, tolerates social news apps in the Google Play Store that routinely transmit "hate speech."

147.    These social news apps include Google's partner Twitter as well as Google's own YouTube.

23

148.    Similarly, while Google Play's policies also explicitly prohibit "apps that contain or promote sexually explicit content, such as pornography," which are defined as "depictions of sex acts" and "apps that promote escort services," Google play in fact, tolerates social news apps in the Google Play Store that expressly allow pornography under certain conditions.

149.    Among the apps available on the App Store that expressly permit pornography as a matter of policy is Google's partner Twitter, whose terms only bar pornographic or excessively violent media from users' profiles or headers, and which flags explicit, graphic or sensitive media as "sensitive media."

150.    The criteria employed by the Google Play Store to bar Gab were, in fact, deployed inconsistently, as are its content criteria in general, in a manner that favors its partner, Twitter, at the expense of competitors such as Gab.

151.    Gab's removal from the Play Store severely undermined Gab's business, because it could no longer benefit from the vast access, technological coordination and comprehensive advertising and promotional benefits Google affords only to apps available on the Play Store and via no other platform or distribution channel.

152.    Because Gab had already been refused, on a false pretext, permission to offer its mobile app on the Apple App Store, Google's action resulted in Gab being essentially barred from the worldwide mobile app market.

153.    Gab's user growth and Pro subscription growth were affected negatively by its removal from the Play Store.

24

154.    Google's action against Gab, cynically labeled as a measure against "hate speech," resulted in some degree of criticism from certain observers and plaudits from those who accepted its rationale from a "social justice" perspective.

155.    The suspension of Gab from the Play Store, however, was not about social justice.

156.    Rather, Google's conduct was the result of predominantly commercial considerations arising from its role not only as an arbiter of content – and hence, of commerce – on the Internet, but as the dominant player in mobile social news.

157.    The social news market differs from the "social media" market, which, while it includes Twitter, Google+ and Gab, also includes decidedly more visual, lifestyle or "socializing"-oriented apps such as Instagram, Tumblr, Pinterest, Snapchat and Meetup.

158.    The social news market also differs from the strict "news" market that, while it also includes Twitter – which is categorized as "news" on the Apple App Store and "News and Magazines" on the Play Store – mainly encompasses mainstream media outlets such as CNN, The New York *Times*, NPR News and other decidedly less "social" sources of news and information.

159.    The social news category and app market, in contrast, is described as an Internet website, now typically accessible in the form of a mobile app, that features user-posted items of news and information, typically ranked based on popularity as voted on by other users of the site or by website administrators and permitting user commentary that can also be ranked.

25

160. Social news apps are also used to share non-news information and content such as humor, support, discussion, photography, location news ("checking in" to places on the map or commercial venues) or multimedia.

161. Social news apps provide a new and innovating way to participate in communities that are constantly being flooded with new information. They include opportunities for personal and professional networking, peer-to-peer learning, a changed attitude toward intellectual property, the diversification of cultural expression, the development of skills valued in the modern workplace, an empowered conception of citizenship and have been shown to affect democratic opinions and perspectives as well as the political process.

162. Offerings in the social news category include Twitter, Google+, Shlashdot, Digg, Reddit and Gab.

**Google and Gab**

163. Having raised all of $1 million via crowdfunding and boasting a low-six-figures membership, would not appear to present an obvious competitive threat to Google.

164. Google's ubiquitous and pervasive stake in and influence over technology, the Internet, e-commerce and social media, however, cause it to evaluate every potential threat to its position seriously and, by the means it deems appropriate, coopted or extinguished.

165. As small as it is, Gab's rapid rise and the personality of its articulate, dynamic young foundered outsized garnered press attention, and not "merely" on social media, soon after it was launched in August 2016.

26

166.    For example, in December of 2016, Agence France-Presse ran a syndicated article, published on Yahoo News and elsewhere, identifying Gab as the online destination of choice for figures banned from Twitter and other social media websites, described by a college professor as "an echo chamber for extremely conservative opinions."   The article contrasts provision of a forum to those who hold such opinions with the actions taken by social media pioneer Reddit to "crack down on 'toxic users' in an effort to curb some incendiary comments from supporters of President-elect Donald Trump."

167.    That same month, the BBC interviewed Mr. Torba and promoted the interview with an article about Gab, writing as follows:

> It's become the go-to social network for an extreme group of activists who have been chucked off of Twitter. So is Gab.ai a free speech alternative or just an alt-right safe space?
>
> Its top hashtags list is a conservative dream. It's peppered with trends like #Trump, #MAGA ("Make America Great Again" - Trump's campaign slogan) along with far-right obsessions like Dump Star Wars and the Pizzagate conspiracy hoax.
>
> But while its founder is indeed a self-identified conservative, Gab.ai does not want to be an exclusive hangout for Republicans, right-wingers or the fringe white nationalist alt-right. . . .
>
> Torba describes himself as a conservative Christian and says he's no fan of the alt-right, but he believes that the recent move by Twitter to kick off several prominent alt-right activists is part of a larger trend towards limiting freedom of expression.

27

"What we've seen happening over the past 18 months or so is extensive censorship and suppression of specifically conservative ideas, news sources and individuals around the world," he says. "Social networks are hiding behind the guise of very subjective terms and guidelines, so they call things hate speech and harassment.

"We believe in free and open expression for everyone on the internet and that's something we want to protect and we want to promote," he told BBC Trending radio.

168.    The BBC article received so much attention ultimately included as a "BBC Trending" story on Facebook.

169.    On August 18, 2017, *Forbes* magazine also covered the story of Gab's incipient growth, focusing on its success at raising $1 million via crowdfunding and its addition of 25,000 users in the previous 30 days.

170.    The final sentence of the article, however, reads, "Gab, though, has already run afoul of the kind of gatekeeping it aims to weaken.  Apple and now Google have both blocked the services' mobile app from their respective stores."

171.    The attention being paid to Gab and the parallel message concerning corporate censorship had several implications for Google.

172.    For one, Gab's message drew attention to the fact that while the Apple App Store had quietly avoided, or at least delayed, criticism for refusing Gab, the supposed "right wing haven" social news app was available on the Play Store, which was a source of embarrassment for Google.

173.    One reason Gab's availability on the Play Store was a source of embarrassment was because of the above-mentioned frenzy in the media and other

28

institutions concerning "hate speech," an epithet which, however unfairly, had come to stick on Gab in the national media.

174.    Google's sensitivity on the matter of "political correctness" was particularly acute at this time, because barely two weeks earlier it had come under intense public scrutiny when it fired a senior engineer, James Damore, in connection with the public leak of an internal memorandum written by him entitled "Google's Ideological Echo Chamber" that criticized Google's "politically correct monoculture."

175.    While Google's firing of Damore appeared only to confirm his accusation, it was consistent with the overwhelming approach to such issues in Silicon Valley and Google in particular, which was to silence dissent.

176.    Google, then, had a considerable "soft" incentive to use the Charlottesville "moment" as cover for eliminating Gab from the Play Store, an action that it likely considered inevitable because of the violent protests and activism directed against "hate speech," monuments of dead generals and any symbol or institution associated with conservative or extreme right-wing messages, which for all practical purposes were elided into one.

177.    As set forth in more detail below, however, Google had an acute, competitive reason to be concerned with the possibility of Gab's success.

**Google, Social Networking and Twitter**

178.    Google competes with Gab in multiple respects.

179.    Google+ is the flagship social networking platform of Google.

29

180. Google+ debuted in June 2011 and is intended to pull all of Google's products such as Gmail, Google Maps, Google search, Google Calendar, YouTube and others into a single comprehensive social and content dashboard.

181. The Google+ Stream is a centralized dashboard for all content shared by connected users of Google+ and includes almost any content that can be uploaded, such as text, images, videos, links, and maps.

182. Google is committed to Google+, having released a major update to its capabilities in January of 2017.

183. According to Google, as of that time 1.7 million new users were signing up to Google+ communities every day.

184. Google+ accounts are automatically created for every Gmail user.

185. Google+ can be used from a wide variety of platforms.

186. Google+ can be accessed via the Application Launcher found on the Gmail web interface or available as an extension in Google's Chrome browser.

187. Google+ can be accessed directly on the web via any browser.

188. Google+ content is included in Google search engine results.

189. Google+ is also distributed by Google as an Android app via the Google Play Store.

190. As of the date hereof, over 4 million users had downloaded the Google+ app via the Google Play Store.

191. Google is also intimately tied, commercially, to the product Gab has identified as its model and chief rival, Twitter.

30

192.     Under a 2015 agreement widely known as the "Google-Twitter Partnership," Google was provided access to Twitter's full tweet stream, known colloquially, because of the volume of data involved – approximately 9,000 tweets per second – as "the firehose."

193.     As a result of the Google-Twitter Partnership, Google does not have to "crawl" Twitter's publicly accessible resources and then index them in order to add tweets to its search engine results.

194.     Doing so without integration into Twitter would be a nearly impossible task even for Google, given the volume of information and the high rate at which Twitter users generate it.

195.     Instead, the Google-Twitter Partnership permits tweets to be processed by Google in a "an easily digestible" form that allows tweets to be readily integrated into search engine results.

196.     Because one of the most valuable features of a search engine, especially with respect to news and information, is timeliness, the addition of Twitter tweets – which in the aggregate comprise a phenomenal and unrivaled source of real-time news and information – to Google search results makes the Google search engine immeasurably more valuable.

197.     In turn, the presentation of Twitter tweets in Google's search results greatly enhances the number of visits by searchers to Twitter.

198.     Put differently, because of the integration resulting from the Google-Twitter Partnership, users do not need to be following a user on Twitter, or even be Twitter users themselves, to see that user's tweets. Instead, search users clicking a result

31

of interest simply find themselves "on Twitter" via the public searchable domain of Google

199.    As a result of the Google-Twitter Partnership, the two companies' user bases have essentially been merged.

200.    Indeed, following the integration of Google and Twitter via the Google Twitter Partnership, Twitter was preinstalled on Android phones and tablets.

201.    Moreover, in June of this year, Twitter redesigned its mobile apps to more appropriately align with the look and feel of Android.

202.    The technological coordination of this process via the Google-Twitter Partnership requires ongoing cooperation between Google and Twitter with respect to each companies algorithmic technology.

203.    One such example of the changes resulting from this cooperation observable by the public is Google search's reckoning with "hashtags."

204.    Hashtags, which became widely known because of their organic development by users on Twitter, are words or phrases – in the latter case, omitting spaces – preceded by a hash or pound sign (#) that are used to identify posts on a specific topic.

205.    Although Google+ first enabled recognition of hashtags in 2013, Google search integrated Twitter hashtag content only after the Google-Twitter Partnership, following which, on May 19, 2015, Google's official blog announced:

> Starting today, we're bringing Tweets to Google Search on mobile devices. So now when you're searching on the Google app or any browser on your phone or tablet, you can find real-time content from Twitter right in the search results.

32

Whether you're interested in the latest from Taylor Swift, news about the #MadMenFinale, or updates on the NBA playoffs, you'll have access to it directly from Google. Let's use NASA as an example—just ask the Google app about "NASA Twitter," and in the search results, you'll see Tweets from @NASA . . .

It's a great way to get real-time info when something is happening. And it's another way for organizations and people on Twitter to reach a global audience at the most relevant moments.

To start, we're launching this on Google.com in English in the Google app (on Android and iOS) and on mobile browsers, rolling out gradually.

206.    Google's integration of Twitter into desktop search, the next step in the knitting together of the two companies' fortunes, was celebrated with a tweet from Google's official account below:



207.    The Google-Twitter Partnership has manifested itself in many other ways that have enabled each company to benefit from the cumulative synergies created by the previous iteration of technological and commercial coordination.

208.    This iterative process, over time, magnifies the market power of each member of the Google-Twitter Partnership and contributes great value to each member of

33

the partnership by what is called the "network effect," through which the value of a product or service as more and more people use it.

209.    For example, advertisers can buy sponsored tweets through Google's DoubleClick ad exchange, giving Twitter access to Google's advertising massive customer base and providing Twitter advertisers to powerful analytical tools to track their ads' reach and effectiveness only available through DoubleClick.

210.    Ultimately, Google's partnership with Twitter has resulted in promotion of Twitter content over content that does not benefit Google financially.

211.    This policy squares with the pay-to-play policy exemplified by the EU finding that Google search favored Google shopping results over those of shopping sites whose sales do not benefit Google.

212.    Moreover, recent reports have confirmed the long-suspected possibility that even editorial content that does not "play by Google's" rules may be "buried" by the putatively objective Google search engine.

213.    In August of this year, for example, highly regarded technology writer Kashmir Hill wrote about her experience as a writer and social media manager for *Forbes* in which Google representatives made it clear that including Google+ functionality when publishing articles on the *Forbes* website would result in more favorable treatment by Google search results, as well as the pressure exerted on her by Google, when she reported on that phenomenon itself, to remove her report from public view.

214.    Like its partner Google, Twitter also engages in the process of favoring and "burying" content, according to many observers.

34

215.    In early 2017, Twitter announced that it would be "collapsing" tweets deemed "low quality" "so the most relevant conversations are brought forward," utilizing an algorithm whose parameters have not been made public.

216.    As a practical result, as observed in a February article on Medium by Mike Keen illustrated by specific examples, negative replies are consistently found at the top of the tweet "thread," or series of tweets and replies, after every tweet sent out by President Trump and other prominent conservative figures. Positive responses made in the first few seconds after such tweets are typically "buried," i.e., assigned lower positions inconsistent with their timestamps, in conservation threads.

217.    Twitter has also been shown to entirely delete or substantially cull large follower bases of major conservative voices, to "throttle" or "shadow ban" them by restricting access to their tweets to those who are retained as followers and to delete user accounts based on subjective decisions concerning content.

218.    Moreover, Twitter, like Gab, includes a system for identify verification, colloquially known as "blue checks," meant to prevent users from being misled by accounts pretending to be owned by high-profile individuals.

219.    Verified status is generally understood to increase the "priority" of a user's tweets pursuant to Twitter's "quality" algorithm.

220.    "Blue checks," however, are widely understood by Twitter users to be mainly, though not exclusively, reserved for users who are not necessarily well known but whose views track those of Twitter management.

35

221.     This suspicion was partially confirmed when, in January of 2016, controversial right-wing figure Milo Yiannopoulos was stripped of his verification "check" for reasons have nothing to do with the verified authenticity of his account.

222.     It is this kind of conduct by Twitter that Gab was created to address by providing an alternative, unbiased forum – the availability of which to users and the sustainability of which to Gab itself was profoundly reduced by the ban of Gab's mobile app from the Play Store by Twitter's partner, Google.

223.     No social media platform has been afforded the level of integration with Google that Twitter has.

224.     On information and belief, the Google-Twitter Partnership is a joint venture in which Google plays the dominant role.

225.     Through the Google-Twitter Partnership and its continuing investment in Google+, Google has achieved its business goal of establishing a position in social media and, through the Twitter and Google+ mobile apps, in dominating the U.S. and global markets for mobile social news apps.

226.     For these reasons, Google has a profound economic incentive to restrict competition in the market for mobile social news apps, as it has done via its pretextual ban of Gab from the Play Store.

227.     As alleged herein, Google has acted on that incentive, consistent with its historical business practices, utilizing its exclusive control over Google Play Store to determine which, if any, mobile social news apps may compete in that market with its own Google+ and with its partner Twitter.

36

**Competitor Cooption**

228.    The fact that Google maintains a separate, putatively competing social media offering in Google+ is not inconsistent with its integration of Twitter as an instrumentality for market participation, dominance and monopolization.

229.    Google has employed a similar business model in other instances, such as in connection with its acquisition of Waze, which beginning in 2010 presented a competitive challenge to the Google Maps navigation app that comes preinstalled on Android devices.

230.    Waze, in fact, used Google Maps as a benchmark for its map quality until Google terminated Waze's access to Google's API, or application programming interface, which is a set of instructions and standards for accessing the program and requesting services from that program.

231.    To compete with Google, Waze offered unique technology not available to Google that emphasized real-time accuracy concerning traffic and other conditions via crowdsourcing.

232.    Although Waze's user base, which provided its crowd-sourcing information, was sufficient to provide a level of "data velocity" that was unique among navigation services, it was not seen as being able to achieve the scale of user adoption necessary to ultimately compete with Google.

233.    Google acquired Waze in 2013 for $1.3 billion, allowing it to merge or integrate its user base and pervasive scope with Waze's technology and thereby create a Waze-powered Google, or a Google-powered Waze.

37

234.    Google still offers Google Maps, just as, after integration with Twitter, it continues to offer Google+.

235.    The process of integrating Waze into Google is demonstrated by Google's Android Auto offering, which became available in March of 2015.

236.    Android Auto is an infrastructure developed by Google to allow an Android device running the Android Auto mobile app to provide a customized user interface when used in a vehicle, most commonly by having it connected to an Android Auto-enabled head unit in the vehicle. Both touchscreen and button-controlled head unit displays will be supported, although hands-free operation through voice commands is encouraged to ensure safe driving. The functionality offers control over mobile GPS mapping and navigation, music playback, messaging, telephony, and web search.

237.    The network effect of Google's integration of Waze into Android can be appreciated by the fact that Android Auto is part of the Open Automotive Alliance, which was announced in 2014, and is a joint effort with 28 automobile manufacturers and mobile tech supplier Nvidia.

238.    Google's integration of Google Maps into the Android platform was and is, itself, a monopolistic and anticompetitive barrier to entry in the market for Android-based navigation services and, in all probability, all mobile navigation services.

239.    As in the case of Waze, Google's integration with Twitter demonstrates how, as a monopolist, it has the power to force the integration of whatever nascent competitors might arise even as each such integration makes the next wave of potential competition progressively less likely.

38

**Google's Restriction of Competition in the**
**Market for Mobile social news Apps**

240.   Google's integration of Twitter into its platforms and offerings, as alleged above, established it as a leading competitor the social news app market.

241.   Google's position as a monopolist with respect to control of the Google Play Store gave it the tools to restrict competition in the market for social news services.

242.   Google's subsequent ban of Gab from the App Store on pretextual grounds is an anticompetitive artifact of Google's position as a monopolist, in particular, in the market for mobile social news apps.

243.   By banning Gab on a pretextual basis, Google demonstrated the harm to competition resulting from Google's monopoly position in the market for mobile social news apps.

**FIRST CLAIM FOR RELIEF**

**(Sherman Act, Section 2  – Monopoly)**

244.   Gab hereby incorporates by reference the allegations set forth above.

245.   As alleged above, Google directly controls the social news app Google+, the streaming video service YouTube, the mobile operating system Android and the dominant market for Android apps, Google Play.

246.   Gab is a competitor with Google with respect to streaming video services.

247.   Gab is a competitor with Google with respect to social news apps.

248.   As alleged above, Google also exercises effective control, through its dominant position in the Google-Twitter Partnership, in the integrated technology and social media offerings of Google+, its own mobile social news app, as well as Twitter, in which Google also has a financial interest.

39

249.     As a result of Google's control over the inputs, distribution channels, markets and sub-markets as set forth above, Google possesses monopoly power sufficient to exclude competitors, including Gab as well as all other prospective or disruptive, and thus competition- and efficiency-enhancing competitors, from the market for mobile social news apps.

250.     Google has exercised its monopoly power via various forms of entry deterrence, including by imposing onerous, subjective and undefined "content" control "moderation" requirements on Gab and on other competitors which cannot be justified by a legitimate business objective.

251.     Compliance with Google's demand that moderate content posted by its users on a viewpoint-discrimination basis would place at risk Gab's critical "safe harbor" protection against claims arising from such content under Section 230 of the Communications Decency Act by turning Gab into an unprotected editor or publisher, whereas it is presently protected as an Internet Service Provider.

252.     By employing its monopoly power to discriminate in favor of online social news apps in which it has a direct financial and strategic interest and to close the Play Store to competitors of such apps, Google has unlawfully restricted competition in the market for mobile social news apps.

253.     Google's ban of Gab from the Play Store has caused a material reduction in Gab downloads.

254.     Because of the reduction in downloads of its mobile app, Gab has been damaged and will, unless the acts complained of here are remedied, continue to be damaged because its prospective revenue is closely tied to total downloads.

40

255.   Google's conduct is intended to, and does, unlawfully protect the financial and strategic benefits it enjoys by virtue of its partnership with Twitter, Gab's chief competitor, from other competitors.

256.   Because Google's conduct is a form of censorship of the uncensored, it constitutes an unlawful secondary boycott of Gab because it boycotts Gab as a penalty for not boycotting Gab users.

257.   To the extent Google's conduct does not meet the definition of a secondary boycott, it is nonetheless unlawful for the same reason as a secondary boycott.

258.   Google's conduct establishes unlawful deterrents to market entry that constitute or are legally equivalent to price fixing because it imposes terms and conditions of sale for access to the market for mobile social news apps.

259.   Google's conduct establishes unlawful deterrents to entry in the market for mobile social news apps that constitute or are legally equivalent to price fixing via horizontal customer allocation.

260.   Google's conduct deprives smaller rivals in the market for mobile social news apps of distribution channels sufficient to achieve efficient scale, thereby raising costs and slowing or preventing effective entry.

261.   Google's conduct establishes unlawful deterrents to entry in the market for mobile social news apps that constitute or are legally equivalent to price fixing as an agreement not to sell or a refusal to sell.

262.   Google's conduct degrades the functionality, security, reliability and hence competitiveness of independent mobile social news apps, especially apps not permitted for download via the Play Store.

41

263.   Google's conduct is directed at maverick or disruptive potential market entrants, typified by Gab, which by virtue of the quality and nature of their offerings are entitled under the law to enhanced protection against anti-competitive conduct.

264.   Because the restraints on trade and the harm to competition arising from Google's conduct are non-price restraints, cross-elasticity of demand cannot be expressed other than in non-price parameters of consumer choice and product-offering quality.

265.   Google's conduct as alleged above restricts competition and reduces consumer welfare because, among other things, it:

    a.   inhibits free speech;

    b.   reduces the data and personal privacy of consumers;

    c.   amounts to its enforcement of censorship policies promulgated by foreign states that are repugnant to the law and the Constitution of the United States;

    d.   increases the incentive for Google itself, as a monopolist, to continue to foreclose competitors such as Gab from competition;

    e.   deprives competitors, on a discriminatory basis, of access to the App Store, which is an essential facility or resource;

    f.   enables Google to leverage its domination of the market for mobile social news apps into even greater market control by maintaining discriminatory access to the Play Store as a barrier to entry.

266.   Google's conduct is motivated by anti-competitive goals, as set forth above, and not on legitimate or lawful competitive justifications.

267.   As a result of Google's conduct as alleged above, Gab and others similarly situated are effectively barred from access to the consumer mobile market.

42

## SECOND CLAIM FOR RELIEF

### (Clayton Act, Section 3 – Tying and Exclusive Dealing)

268.   Gab hereby incorporates the allegations set forth above.

269.   Google's conduct as alleged above amounts to an unlawful accretion of economic power, concentration, monopoly or oligopoly in the market for mobile social news apps.

270.   Google's conduct as alleged above has created conditions in the market for social news apps that encourage the creation of parallel policies of mutual advantage for dominant firms in that market, rather than conditions that favor competition.

271.   Google's conduct as alleged above unreasonably and unlawfully discourages the entry into the market of small but potentially significant competitors such as Gab which could thwart the trend toward concentration.

## THIRD CLAIM FOR RELIEF

### (Tortious Interference with Prospective Economic Advantage)

272.   Gab hereby incorporates the allegations set forth above.

273.   Gab had a prospective contractual or business relationship with users of the Android operating system who download apps via the Play Store.

274.   The above-alleged conduct by Google prevented these prospective relationships from occurring.

275.   Google's conduct in preventing such relationships from materializing was knowing and intentional.

276.   Google's conduct was not privileged or justified.

277.   Gab was harmed by Google's interference.

278.   Gab has no adequate remedy at law.

**WHEREFORE**, Plaintiff Gab, Inc prays for an order of the Court:

A.      Entering judgment in its favor and against defendant Google, LLC.;

B.      Granting a preliminary and permanent injunction restraining defendant, and all individuals acting in concert or participation with it, from further monopolizing behavior;

C.      Awarding plaintiff a money judgment against defendant for its damages;

D.      Awarding plaintiff actual, statutory and treble damages under the Clayton Act;

E.      Awarding plaintiff its reasonable attorneys' fees, costs and disbursements incurred herein in view of defendants' intentional and willful conduct and restraint of trade; and

F.      Awarding Gab such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Gab, demands a trial by jury of all matters so amenable.

Respectfully Submitted,

**RANDAZZA LEGAL GROUP PLLC**
By: A. Jordan Rushie, Esq.
PA ID: 209066
1010 N. Hancock Street
Philadelphia, PA 19123
P. 215.268.3978
F. 215.525.0909
ajr@randazza.com

44

*Verification*

I, Andrew Torba, authorized representative of Gab AI Inc., state
that I have personal knowledge of the facts in the above Complaint.
I verify them as true, subject to the penalties of 18 Pa. C.S. § 4904,
Unsworn Falsification to Authorities, and under penalty of perjury
of the laws of the United States of America.

*Andrew Torba*

*Andrew Torba*

Date: September 14, 2017